**B**

Date Filed 11/20/2023 12:53 PM Case 1:24-cv-10415-BEM   Document 1-2   Filed 02/21/24   Page 2 of 33
Superior Court - Middlesex
Docket Number

1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT
                                                 C.A. NO. 23 CV 3255

CAROL REILLY, as personal              )
representatives of THE ESTATE          )
OF BRENDAN MICHAEL                     )
REILLY,                                )
      Plaintiff,                       )
                                       )
                                       )
v.                                     )
                                       )
TOWN OF LEXINGTON,                     )
OFFICER STEVEN PAPIA,                  )    **COMPLAINT AND JURY DEMAND**
individually, OFFICER JOHN             )
FRISSORI, individually, OFFICER        )
JOSEPH CARRUTHERS,                     )
individually, INNOVIVE HEALTH          )
OF MASSSACHUSETTS, LLC,                )    11/20/2023      RECEIVED  MG
f/k/a NIZHONI HEALTH                   )
SYSTEMS, LLC., CATHERINE               )
MUNYA, ALULA AFEWORK,                  )
ELIOT COMMUNITY HUMAN                  )
SERVICES, INC., PATRICK                )
AKER and MARY DARBY                    )
Defendants.                            )

### Parties

1.    The Plaintiff, Carol Reilly, as personal representative of The Estate of Brendan Michael

      Reilly ("Plaintiff"), is the mother of Brendan Michael Reilly, and duly appointed personal

      representative of the Estate of Brendan Michael Reilly pursuant to Letters of Authority,

      dated April 27, 2022, issued by Judge Natola, Middlesex Probate and Family Court. *See*

      Docket No. MI22P2086EA.

2.    The Defendant, Town of Lexington ("Town"), is a Massachusetts municipality located in

      Middlesex County and organized under the laws of Massachusetts with its Town hall

      located at 1625 Massachusetts Avenue, Lexington, Middlesex County, Massachusetts.

The Town promulgated and otherwise adopted under the color of state law, rules, practices, procedures, policies, and other customs to be followed by law enforcement officers.

3. The Defendant, Officer Steven Papia ("Officer Papia"), is a duly appointed officer of the Lexington Police Department ("LPD"). At all relevant times, Officer Papia was employed by the LPD and was acting within the scope of his employment under the color of state law. The action is brought against him in his individual capacity.

4. The Defendant, Officer John Frissori ("Officer Frissori"), is a duly appointed officer of the Lexington Police Department ("LPD"). At all relevant times, Officer Frissori was employed by the LPD and was acting within the scope of his employment under the color of state law. The action is brought against him in his individual capacity.

5. The Defendant, Officer Joseph Carruthers ("Officer Carruthers"), is a duly appointed officer of the Lexington Police Department ("LPD"). At all relevant times, Officer Carruthers was employed by the LPD and was acting within the scope of his employment under the color of state law. The action is brought against him in his individual capacity.

6. The Defendant, Innovive Health of Massachusetts, LLC, formerly known as Nizhoni Health Systems, LLC ("Nizhoni"), is a Massachusetts corporation with a principal place of business located at 10 Cabot Road, Suite 101, Medford, MA.

7. The Defendant, Alula Afework, was, at all relevant times an employee of Nizhoni and is a resident of the Commonwealth of Massachusetts.

8. The Defendant, Catherine Munya, was, at all relevant times an employee of Nizhoni and is a resident of the Commonwealth of Massachusetts.

2

9. The Defendant, Eliot Community Human Services, Inc. ("Eliott"), is a Massachusetts corporation with a principal place of business located at 125 Hartwell Avenue, Lexington, MA.

10. The Defendant, Patrick Aker ("Aker"), was the employee of Eliot responsible for overseeing/coordinating Brendan's needs while he was a resident at Eliot properties.

11. The Defendant, Mary Darby ("Darby"), was the employee of Eliot responsible for overseeing/coordinating Brendan's medical needs and assuring that he received his necessary medications.

### Facts Common to All Counts

12. The Plaintiff re-alleges and incorporates by reference paragraphs 1-11 as if expressly written.

13. Brendan Michael Reilly ("Brendan"), a citizen of Lexington, Massachusetts, was born to Carol and Kenneth Reilly on June 18, 1986.

14. Since his late teens Brendan struggled with mental illness including depression and psychosis.

15. Brendan was clinically diagnosed with anxiety and bipolar I disorder.

16. Eliot is the owner of 98 Hancock Street, Lexington, Massachusetts ("Property").

17. The Property is operated by Eliot as a group home for people suffering from mental health issues.

18. Eliot was responsible for assuring that its residents, including Brendan, received their necessary medications and other mental health services.

19. Prior to February 9, 2021 Eliot contracted with an agency called Comfort Home Care such that Comfort Home Care delivered and administered Brendan's medications to him.

20. Due to Brendan's documented mental health conditions he was required to receive medications twice daily, once in the morning and once in the afternoon.

21. Comfort Care employees thus visited the Property twice a day, once in the morning before 9:00 am and again in the afternoon to supply Brendan his necessary medications.

22. On February 9, 2021 Brendan became agitated and attempted to break into the metal lock box which contained his medications.

23. Carol Reilly and Brendan Reilly reported this event to Eliot.

24. As a result of the February 9 incident Comfort Home Care ceased providing medications to Brendan and informed Eliot that Eliot would need to obtain a new provider for these necessary services.

25. Eliot agreed to resume responsibility for administering Brendan his medications until a new provider could be arranged.

26. Eliot then contracted with the defendant, Nizhoni, for Nizhoni to take over the responsibility of delivering and administering the necessary mental health medications to Brendan.

27. As of February 11, 2021 Nizhoni assumed responsibility for assuring that Brendan received his necessary psychiatric medications.

28. Pursuant to the agreement between Eliott and Nizhoni, Nizhoni was required to visit the Property twice daily to administer prescription medications to residents of the Property.

29. On February 11 Alula Afework ("Afework") met with Brendan Reilly as part of the intake process for Brendan to receive care from Nizhoni.

30. Afework decided that Brendan only needed his medications once per day, in the morning.

31. Afework did not consult with any mental health professional prior to making the determination to change Brendan's medication schedule and he was not qualified, through education or training to make such a determination.

32. As a result of Afework's decision, Brendan did not receive his afternoon medications on February 11, 2021.

33. On the morning of February 12, 2022, the defendant, Catherine Munya ("Munya") arrived at the Property to administer prescribed medications to Brendan, but failed to do so and left the Property without administering the necessary medications.

34. The Plaintiff did not receive his prescribed anti-psychotic medications on the morning of February 12, 2022.

35. At approximately 11:30 am on February 12 Nizhoni advised Eliot that Brendan had not received his morning anti-psychosis medication.

36. Neither Nizhoni nor Eliot made any effort to assure that Brendan received his medication.

37. As of the late morning, February 12, 2021 Brendan had been without his necessary medications since the morning of February 11.

38. The Defendant, Akers, in his role at Eliot, knew, or should have known that Brendan had been without his necessary anti-psychotic medications for more than a day.

39. The Defendant, Darby, in her role at Eliot, knew, or should have known that Brendan had been without his necessary anti-psychotic medications for more than a day.

40. By the late morning on February 12, as a result of not receiving his medications, Brendan began to experience a psychotic break from reality.

41. Unaware that his medications had not been delivered, Brendan began to accuse his housemates of having stolen his medication.

42.  By approximately noon time on February 12, Brendan was so agitated that he began to bang on his housemate's door and verbally threaten him with harm.

43.  As a result, Brendan's housemate barricaded himself in his room and began to yell out the window that someone was trying to kill him.

44.  On or about, 12:15 p.m. on February 12, 2022, the Lexington Emergency Management ("LEM") received a 911 call from a passerby of the Property.

45.  The passerby reported an Asian male with long black hair leaning out of the second story front window of the Property screaming for help and that someone was attacking him.

46.  Lexington Emergency Management dispatched LPD Officer Papia and Officer Frissori to the Property, informing the officers that the Property is a group home operated by Eliott.

47.  The LPD had responded to the Property on previous occasions.

48.  Officer Papia had responded to the Property on previous occasions.

49.  Officer Frissori had responded to the Property on previous occasions.

50.  By February 12, 2022 it was known and recognized by American law enforcement, including LPD, that standard procedures for deescalating included the use of "tactical repositioning" which involves the concepts of time, distance, and barriers.

51.  As of February 12, 2022, it was widely accepted by American law enforcement that:

   a.  Police officers attempting to de-escalate a situation should create distance between the subject and themselves in order to provide the officer more time to response to a threat;

   b.  Police officers attempting to de-escalate a situation in a confirmed space should make use of available physical barriers in order to lengthen the time that is available to respond to a threat;

      c.     Police officers attempting to de-escalate a situation should employ the benefit of time, which tends to slow the situation down, allow for more or better human resources or equipment to arrive at the scene, and allow officers to formulate a cogent response to the situation.

52. As of February 12, 2022, the Town and LPD did not have specific, written or unwritten, policies relating to de-escalation techniques in response to a person suffering a mental health crisis.

53. As of February 12, 2022, the Town and LPD did not have any specific policies related to interacting with a person suffering a mental health event.

54. Upon arrival Officer Papia contacted LEM dispatcher and requested a clinician from Eliott to be sent to the Property.

55. Officer Papia also requested Fire and EMS to be dispatched to the Property but specifically requested Fire and EMS to be kept staged nearby.

56. Officer Papia arrived at the front of the Property and found an Asian male with long hair leaning out of a second story window.

57. At the approximate same time, a second male exited the home.

58. Officer Papia did not detain this second male or conduct an interview of him to ascertain what was occurring at the Property.

59. Officer Papia never entered the dwelling on the Property.

60. Officer Friossori arrived and as he neared the Property was approached by a neighbor and told that a person was in the backyard of the Property.

61. Officer Frissori was told by the neighbor that the individual in the back of the Property had a knife.

62. Officer Frissori relayed this information to Officer Papia and both officers approached the backyard area of the Property via the driveway.

63. The backyard area of the Property is fenced with the only exit being either through the dwelling or down the driveway.

64. Officer Papia and Officer Frissori visually observed Brendan in the backyard of the Property.

65. Officer Papia and Officer Frissori knew Brendan from previous encounters at the Property and in the community.

66. When Officers Papia and Frissori first saw Brendan, Brendan was in the backyard of the Property eating a back of Cheetos and holding a kitchen steak knife ("Knife") in his hand.

67. When Officers Papia and Frissori first saw Brendan, Brendan was not threatening anyone or acting in a threatening manner.

68. Officer Frissori deployed and extended his service baton.

69. Brendan was not, and did not, threaten the officers with the knife and did not brandish the knife in a threatening manner at this time.

70. Officer Papia left the backyard area and returned to his police cruiser to retrieve a Remington 870 shotgun.

71. At some time, years prior to this incident, the LPD and the Town had adopted a policy ("Policy") related to the use of the Remington 870 shotgun loaded with bean bag ammunition.

72. LPD and the Town recognized that the use of such a shotgun with bean bag ammunition constituted a form of lethal force, but a "less lethal" force.

73. The LPD Policy requires that the Super-Sock ("Super-Sock" trademarked) less lethal ammunition is the only approved ammunition approved for use and shall be used.

74. Super-Sock is the registered trademark of CTS, a Division of Combined Systems, Inc. located in Pennsylvania.

75. The Super-Sock round is a drag stabilizing pain compliance bean bag shotgun round and designed to "produced sufficient deterrent energy at impact."

76. The Super-Sock does not require a minimum distance of use as it does not have to open up to stabilize.

77. The LPD Use of Force Policy prohibits the use of the Super-Sock round with fifteen (15) feet of a target.

78. The LPD Use of Force Policy requires, prior to use, that officers ensure that only the authorized and department approved less lethal round be used by physically and visually inspecting each round prior to loading so as to ensure the absence of other ammunition.

79. Officer Papia did not, on February 12, 2022 inspect the shotgun he was using that day to assure that it had the proper ammunition. In fact, the shotgun was loaded with a different, and non-approved bean bag.

80. Upon retrieving the shotgun from the police cruiser, Officer Papia returned to the backyard of the Property.

81. At this time, both Officer Papia, with a shotgun displayed, and Officer Frissori, with an extended baton displayed, began to interact with Brendan.

82. Rather than speaking calmy with Brendan, Officers Papia and Frissori utilized "command" voices, yelling at Brendan and ordering him to drop the knife, among other things.

83. LEM dispatched Officer Carruthers and others to the scene.

84. When Officer Carruthers arrived, he also retrieved a Remington 870 shotgun from his police cruiser.

85. On February 12, 2022  Officer Carruthers did not inspect the shotgun he was using that day to assure that it had the proper ammunition.  In fact, the shotgun was loaded with a different, and non-approved bean bag.

86. As Officer Carruthers approached the Property, Brendan ran from the Property and up Hancock Street toward a rotary.

87. Officer Papia fired the shotgun at Brendan as Brendan ran away.

88. Brendan was struck in the back by the bean bag round and fell down.

89. Officers Papia, Frissori and Carruthers then formed a semi-circle around Brendan.

90. Brendan remained on the ground for the next approximately fifteen (15) minutes while surrounded by Police Officers.

91. During the time Brendan was on the ground Officers Papia, Frissori and Carruthers knew and recognized that Brendan was suffering from a mental health breakdown.

92. During the time Brendan was on the ground Officer Papia never utilized any de-escalation techniques but rather engaged in increasingly loud and commanding orders to Brendan to "drop the knife".

93. During the time Brendan was on the ground none of the officers requested that a supervisor come to the scene.

94. During the time Brendan was on the ground none of the officers made a determination as to which officer (if any) was in charge.

95. During the time Brendan was on the ground no officer took charge.

96.  During the time Brendan was on the ground and suffering from a mental health issue, the
     three (3) defendant officers yelled at him from various positions and failed to de-escalate
     the situation.

97.  During the time Brendan was on the ground surrounded by the officers, no officer
     suggested bringing mental health or other health care providers to the scene to speak with
     Brendan.

98.  During the time Brendan was on the ground Officer Carruthers gave his shotgun to
     Officer Frissori and unholstered and drew his department issued Glock handgun.

99.  While Brendan was on the ground and making no threatening gestures or attempting to
     escape, Officer Papia repeatedly discharged his shotgun at Brendan, striking him
     repeatedly.

100. Many of these rounds were fired at Brendan from a distance of less than fifteen (15) feet.

101. While Brendan was on the ground and making no threatening gestures or attempting to
     escape, Officer Frissori repeatedly discharged his shotgun at Brendan, striking him
     repeatedly.

102. Many of these rounds were fired at Brendan from a distance of less than fifteen (15) feet.

103. Towards the end of the fifteen minutes Officer Papia became frustrated with Brendan's
     non-compliance with his repeated shouted orders.

104. Towards the end of the fifteen minutes Officer Papia became angry that Brendan had not
     complied with the multiple shouted orders to drop the knife.

105. Towards the end of the fifteen minutes Officer Papia became frustrated and angry with
     what he perceived as the ineffectiveness of the bean bag rounds.

106. As a result of his anger and frustration, Officer Papia moved close to Brendan while Brendan lay on the ground.

107. As a result of his anger and frustration, Officer Papia fired two more shotgun blasts at Brendan from a distance of only a few feet.

108. One of these rounds was fired at point blank range directly into Brendan's lower left thigh.

109. The bean bag round (with red cap) penetrated the skin, muscle, and sinew of Brendan's back left lower thigh just above the knee.

110. After firing this round at point blank range and after observing the pain it caused Brendan, Officer Papia attempted to quickly retreat back to the safe distance he had been.

111. In the process of backing up quickly Officer Papia fell.

112. Some witnesses claim that Brendan "got up" and attempted to approach Officer Papia.

113. Other witnesses claim that Brendan reacted to the shots but never got to his feet.

114. Within four seconds of the final bean bag round being fired, Officer Carruthers fired four (4) lethal rounds of a his service sidearm at Brendan, striking Brendan four times in the chest.

115. Brendan was later pronounced dead at Lahey Hospital.

116. The bean bag projectiles loaded in the shotguns utilized by the LPD on February 21, 2023 and discharged at Brendan by Officers Papia and Frissori were tail-stabilized ALS 1212-T Triton rounds, not approved for use by LPD or the Town.

117. The ALS 1212-T Triton round is manufactured by ALS – a Pacem Defense Company located in Florida.

118. The ALS 1212-T Triton round has a minimum required distance from target of 18 feet.

**COUNT I**
**(Plaintiff v. Officers Papia, Frissori and Carruthers)**
**Violation of 42 U.S.C. § 1983**
**Violation of Plaintiff's Fourth Amendment Rights**

119.   The Plaintiff re-states and realleges paragraphs 1-118 as if expressly written.

120.   At all relevant times, Brendan was a citizen of the United States.

121.   At all relevant times, the Officers Papia, Frissori and Carruthers were persons for the
       purposes of 42 U.S.C. § 1983.

122.   At all relevant times the Officers Papia, Frissori and Carruthers were acting under the
       color of state law in their capacities as officers of the LPD, an agency of the Town, and
       they conducted their acts and omissions within the scope of their official duties or
       employment.

123.   The Fourth Amendment to the United States Constitution guarantees citizens the right to
       be secure in their persons against unreasonable search and seizures of the person.

124.   At the time of the events on February 12, 2022, Brendan had clearly established
       constitutional rights under the Fourth Amendment to bodily integrity and to be free from
       unreasonable and excessive force by law enforcement officers.

125.   Officers Papia, Frissori and Carruthers seized Brendan within the meaning of the Fourth
       Amendment.

126.   When Officers Papia, Frissori and Carruthers shot Brendan with less-lethal and lethal
       force, Brendan was within their custody and control.

127.   An objectively unreasonable use of less-lethal and lethal force by a police officer
       constitutes a violation of the Fourth Amendment to the United States Constitution.

128.  Acts that unreasonably create a situation and risk level requiring officers to use lethal force against a seized person constitute a violation of the Fourth Amendment to the United States Constitution.

129.  Officers Papia, Frissori and Carruthers acted unreasonably by failing to fully investigate the reason for the 911 call, displaying pain compliance weapons in the presence of an obviously mentally ill and terrified subject and using pain compliance weapons on an obviously mentally ill and terrified person.

130.  Officers Papia, Frissori and Carruthers acted unreasonably by needlessly creating exigent circumstances, heightening the physical safety risks to everyone involved, reducing the possibility of de-escalating the situation, and unnecessarily shortening the timeframe available for intervention of personnel qualified to speak to Brendan while he was suffering a mental illness episode.

131.  Officers Papia, Frissori and Carruthers acted unreasonably by telling Brendan that help was on the way and asking to allow them to get him to a hospital, while at the same time having Fire and EMS staged out of sight in the vicinity thus preventing medical care for Brendan.

132.  Officers Papia, Frissori and Carruthers acted unreasonably by firing, and allowing to be fired, including at point blank range, projectiles which struck Brendan on multiple occasions, including one which embedded into his back left leg at times when Brendan was not posing a threat to them or attempting to flee.

133.  Officers Papia, Frissori and Carruthers' actions and inactions, violated Brendan's Fourth Amendment right to bodily integrity and the right to be free from unreasonable and excessive force by law enforcement officers.

134. As a direct and proximate result of Officers Papia, Frissori and Carruthers' intentional conduct, Brendan was subjected to extreme brutality, excessive and ultimately lethal force during the seizure.

135. An objectively reasonable law enforcement officer would have understood throughout the encounter with Brendan, that firing up to eight (8) less lethal rounds, at a subject on the ground, and within point blank range clearly violated established case law and general Fourth Amendment principles and statements of law.

136. Officers Papia, Frissori and Carruthers' intentional and excessive use of lethal force, and their intentional disregard of the risks associated with their actions, were such obvious and/or apparent violations of the Fourth Amendment's prohibition against unreasonable search and seizures that a reasonable officer would not have required prior case law on point to be on notice that his or her conduct was unlawful or unconstitutional.

137. A reasonable law enforcement officer in Officer Papia, Frissori or Carruthers' position would, or should, have understood that their conduct and the conduct of others, violated Brendan's right to be free from the excessive use of lethal force.

138. The Plaintiff is thereby entitled to damages and attorney fees pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE the plaintiff demands judgment against Officer Papi, Officer Frissori, and Officer Carruthers, jointly and severally with all other defendants herein in an amount to be determined by a jury plus costs, interest, attorney's fees, and punitive damages.

### COUNT II
**(Plaintiff v. Officers Papia, Frissori and Carruthers)**
**Violation of 42 U.S.C. § 1983**
**Violation of Plaintiff's Fourteenth Amendment Rights**

139. The Plaintiff re-states and realleges paragraphs 1-138 as if expressly written.

140.   The Fourteenth Amendment to the United States Constitution protects a person from the deprivation of life, liberty, and property without due process of law.

141.   The conduct of Officers Papia, Frissori and Carruthers, as described within the Plaintiff's complaint, was committed under the color of law and reflected a reckless and callous disregard to Brendan's clearly established rights, in violation of Brendan's Fourteenth Amendment right to life.

142.   As a direct and proximate result of Officers Papia Frissori and Carruthers' reckless and callous behavior and indifference, Brendan was deprived of his life without due process of law.

143.   Officer Papia, Frissori and Carruthers' violation of Brendan's Fourteenth Amendment rights through their reckless and callous conduct was clearly established under existing case law or general Fourteenth Amendment principles and statements of law and they knew their actions and inactions were unlawful and unconstitutional.

144.   A reasonable officer would not have required prior case law on point to be on notice that their conduct in creating a situation resulting in death violated Brendan's Fourteenth Amendment rights.

145.   The Plaintiff is therefore entitled to damages and attorney fees pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE the plaintiff demands judgment against Officer Papi, Officer Frissori, and Officer Carruthers, jointly and severally with all other defendants herein in an amount to be determined by a jury plus costs, interest, attorney's fees, and punitive damages.

<u>**COUNT III**</u>
**(Plaintiff v. Town of Lexington)**
**Violation of 42 U.S.C. § 1983**
**Negligent Training and Supervision**

146.  The Plaintiff restates and realleges paragraphs 1-145 as if expressly written.

147.  As of February 12, 2022, the Town had a policy of deliberate indifference towards persons with mental illness, including Brendan.

148.  As of February 12, 2022, the Town had a policy of deliberate indifference to hiring, training, supervision and discipline of officers.

149.  The Town, through its agents, servants, and employees of the LPD, possessed the duty to train and supervise police officers regarding:

   a.  How to deal with an individual experiencing a mental health emergency;

   b.  How to de-escalate a situation where and individual is experiencing a mental health emergency;

   c.  The appropriate use of force while encountering a person experiencing a mental health crisis;

   d.  Methods of prolonging a confrontation to permit qualified personnel, including medical personnel, to arrive at the scene, where the qualifications of on-site personnel are insufficient to address the mental health and safety needs of the subject;

   e.  Methods of avoiding the use of lethal force upon a seized person, especially if the person is exhibiting obvious signs of a mental health crisis;

   f.  The implementation of the concepts of time, barrier, and distance in the context of confronting a person experiencing a mental health crisis;

g.  The implementation of appropriate safety protocols and measures to assure only proper, appropriate, and approved ammunition is used by LPD.

150.  The Town, through its agents, servants, and employees of the LPD, possessed the duty to establish policy and procedures for police officers regrading:

a.  How to deal with an individual experiencing a mental health emergency;

b.  How to de-escalate a situation where and individual is experiencing a mental health emergency;

c.  The appropriate use of force while encountering a person experiencing a mental health crisis;

d.  Methods of prolonging a confrontation to permit qualified personnel, including medical personnel, to arrive at the scene, where the qualifications of on-site personnel are insufficient to address the mental health and safety needs of the subject;

e.  Methods of avoiding the use of lethal force upon a seized person, especially if the person is exhibiting obvious signs of a mental health crisis;

f.  The implementation of the concepts of time, barrier, and distance in the context of confronting a person experiencing a mental health crisis;

g.  The implementation of appropriate safety protocols and measures to assure only proper, appropriate, and approved ammunition is used by LPD.

151.  On or before February 12, 2022, the Town's policymakers knew or should have know through the exercise of reasonable care that LPD officers would be required to respond to scenes involving persons suffering from mental illness or persons with mental illness who

posed potential threats to themselves or others, but who could be confronted and treated in a manner that avoided the need to use lethal force.

152.  On or before February 12, 2023, the Town's policymakers knew or should have known through the exercise of reasonable care that LPD officers would need to address situations where a person suffering from mental illness behaved erratically or irrationally and needed to drop an object that could threaten their own safety or the safety of others.

153.  The Town's policymakers knew or should have known the LPD would need to know how to handle a situation and what to do.  The Town failed to train its officers on what to do in such a foreseeable situation, which occurred on February 12, 2022, during the midst of a mental health crisis at a known group home within the Town and the Commonwealth of Massachusetts.

154.  The Town failed to have a supervisor protocol for the use of less lethal weapons, a supervisor protocol for mental health encounters, and failed to have a social worker or mental health counselor available to respond to situations involving a mental health crisis.

155.  The Town knew that Officer Papia had, prior to February 12, 2022, utilized his Remington 870 shotgun in interactions with mentally ill persons in circumstances in which such force was not justified.

156.  The Town never trained, provided corrective supervision to, or disciplined Officer Papia for his prior actions.

157.  The Town's failure to train and supervise LPD officers to act in accordance with its own written policy on the use, deployment, and inspection of Remington 870 shotguns and

associated ammunition violated generally acceptable police practices throughout the encounter with Brendan on February 12, 2022.

158. The actions and inactions of Officers Papia, Frissori and Carruthers on February 12, 2022, exhibited more than a one-off event – rather the actions exposed a systemic failure of the Town to train and supervise members of the LPD.

159. The actions and inactions of Officers Papia, Frissori and Carruthers on February 12, 2022, demonstrated that the Town failed to provide adequate training or establish policies in subject areas, such as:

a.    The proper and reasonable manner of dealing with a mentally ill person – who at the time of confrontation was minding his own business in the backyard of the Property;

b.    The proper manner of de-escalating in situations where a mentally ill person has, or recently had, a kitchen steak knife in their hand;

c.    The proper and reasonable manner of de-escalating a situation as opposed to screaming and shouting commands while using pain compliance weapons which forces a violent encounter;

d.    The proper and reasonable procedures and policies for taking control of a scene involving multiple officers and establishing protocol for a supervisor and a clear chain of command;

e.    A proper and reasonable manner for the use and deployment of less lethal ammunition and shotguns;

f.    A proper and reasonable manner for the loading, purchasing, and disseminating of ammunition to LPD officers;

g.    The proper and reasonable manner and protocol for checking the ammunitions loaded into a less lethal shotgun before its use;

h.    The proper and reasonable manner for providing Fire and EMS services to someone suffering from a mental health crisis – and in need of medical treatment.

160.    The Town's custom and practice of inadequate training and supervision of LPD officers constituted deliberate indifference of clearly established constitutional rights of others, including Brendan, to be free from the unreasonable use of force and the deprivation of life without due process of law.

161.    The Town knew of the risks to the constitutional rights of persons with mental health illnesses who would and could be confronted by LPD officers, and failed to act in a manner that ensured the proper preparedness of its officers to address such situations.

162.    Due the Town's deliberate indifference, the Plaintiff is entitled to damages and attorney fees pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE the plaintiff demands judgment against the Town, jointly and severally with all other defendants herein in an amount to be determined by a jury plus costs, interest, attorney's fees, and punitive damages

## COUNT IV
**(Plaintiff v. Officers Papia, Frissori, Carruthers and the Town of Lexington)**
**Violation of 42 U.S.C. § 1983**
**Unconstitutional Failure to Provide Mental Health Treatment in Violation of the**
**Fourteenth Amendment's Right to Due Process**

163.    The Plaintiff restates and realleges paragraphs 1-162 as if expressly written.

164.    Officers Papia, Frissori, and Carruthers and the Town are persons within the meaning of 42 U.S.C. § 1983.

165.   At all times relevant Officers Papia, Frissori and Carruthers acted under the color of law
       and withing the scope of their employment with LPD.

166.   On February 12, 2022, Brendan was seized for purposes of the Fourth Amendment of the
       United States Constitution and as such was in the custody and control of the officers.

167.   On and before February 12, 2022, Officers Papia, Frissori and Carruthers and the Town
       had actual or constructive knowledge that Brendan suffered from mental health issues.

168.   On February 12, 2022, at the inception of the passerby's call to LEM, LPD, the Town,
       and Officers Papia, Frissori and Carruthers were aware that the Property housed persons
       suffering from various degrees of mental health illness.

169.   On February 12, 2022, Officers Papia, Frissori and Carruthers knew Brendan from
       previous non-violent encounters and were aware from his appearance on February 12,
       2022 that he was in serious need of emergency mental health care.

170.   Officers Papia, Frissori and Carruthers deliberately and unreasonably withheld medical
       care by instructing Fire and EMS to not be deployed to the scene until after Brendan was
       shot at least seven (7) times with unauthorized less lethal rounds and four (4) lethal
       rounds.

171.   Officers Papia, Frissori and Carruthers' failure to allow emergency medical care was
       directly related to the Town's failure to properly train and supervise the officers and its
       deliberate indifference to the needs of the mentally ill.

172.   Common practices, policies, and customs of law other enforcement agencies around the
       country is to provide and/or facilitate emergency medical care for those in need.

173.   Officers Papia, Frissori and Carruthers' failure to allow medical personnel, including Fire
       and EMS staged nearby, led directly to Brendan' death.

174. Officers Papia, Frissori and Carruthers' actions and inactions were taken with a reckless disregard and deliberate indifference to Brendan's constitutional rights.

175. Due to the officers withholding of emergency medical care, the Plaintiff is entitled to damages and attorney fees pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE the plaintiff demands judgment against Officer Papi, Officer Frissori, Officer Carruthers and the Town, jointly and severally with all other defendants herein in an amount to be determined by a jury plus costs, interest, attorney's fees, and punitive damages

### COUNT V
**(Plaintiff v. Town of Lexington)**
**Violation of American with Disabilities Act**
**Failure to Provide Reasonable Accommodations to Brendan**

176. The Plaintiff restates and realleges paragraphs 1-175 as if expressly written.

177. Title II of Americans with Disabilities Act ("ADA") states:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

*See* 42 U.S.C. § 12132.

178. Brendan's mental health impairments limited one or more of his major life activities. For the purposes of the Americans with Disabilities Act ("ADA"), Brendan was a person with a disability.

179. At all relevant times, Brendan was a "qualified individual with a disability" pursuant to the ADA.

180. As a resident of Lexington, MA, Brendan was qualified and entitled to participate in programs, services, and activities in the Town, including receiving emergency medical care and services and other appropriate assistance from LPD.

181. Officers Papia, Frissori and Carruthers and the Town failed to employ reasonable techniques, policies, and procedures for dealing with persons they knew or should have known to be disabled by mental illness. This failure constituted discrimination under the ADA.

182. Unreasonably subjecting persons with mental illness to threats of physical violence, screaming, yelling, and otherwise ordinary police techniques can render encounters with person suffering from mental illness to become unreasonably and unnecessarily violent and deadly.

183. At all relevant times, the Town and Officers Papia, Frissori and Carruthers knew or should have known of their obligations under the ADA to provide reasonable accommodations to Brendan based on his disability.

184. The LPD, the Town, and the officers all had previous non-violent encounters with Brendan (one as early as the prior week).

185. Officer Papia knew at or near the time he exited his police cruiser to call for mental health services and Fire and EMS.

186. The actions and inactions of Officers Papia, Frissori and Carruthers amounted to discrimination under the ADA by excluding Brendan from participating in public benefits, such as medical treatment from Fire and EMS.

187. The officers failed to provide reasonable accommodations to address Brendan's known mental health crisis and instead resorted to the use of force which resulted in the torture and death of Brendan.

188.    Officer Papia, Frissori and Carruthers' unlawful discrimination by excluding Brendan

from public emergency medical services and failure to reasonably accommodate

Brendan's disability caused his death.

189.    The Town is vicariously liable for Officer Papia, Frissori and Carruthers' unlawful

discrimination of Brendan.

WHEREFORE the plaintiff demands judgment against the Town jointly and severally with all

other defendants herein, in an amount to be determined by a jury plus costs, interest, attorney's

fees, and punitive damages

### COUNT VI
**(Plaintiff v. Town of Lexington)**
**Violation of the Rehabilitation Act**

190.    The Plaintiff restates and realleges paragraphs 1-189 as if expressly written.

191.    Section 504 of the Rehabilitation Act states:

> No otherwise qualified individual with a disability in the United States . . .
> shall, solely by reason of her or his disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial assistance[.]

*See* 29 U.S.C. § 794.

192.    The Town is a recipient of "federal financial assistance" within the meaning of the

Rehabilitation Act, and the Town's services in the form of emergency responders –

including the LPD, Fire and EMS services – constitute a "program or activity" that the

Town provides.

193.    The Town and Officers Papia, Frissori and Carruthers excluded Brendan from

participating in or denied him the benefits of public service, or otherwise discriminated

against him on the basis of his disability.

194. The Town and Officers Papia, Frissori and Carruthers knew Brendan had a disability and failed to reasonably accommodate his disability by withholding medical services while violently shooting him with less-lethal force and ultimately lethal force.

195. As a result of the Town and the officers failure to accommodate Brendan's disability, Brendan was unreasonably suspected of wrongdoing, unreasonably seized, repeatedly shot with less lethal force rising to the level of torture, and ultimately shot and killed with more lethal force.

196. As a result of the Town's failure to provide reasonable accommodations in violation of the Rehabilitation Act, the Plaintiff suffered damages, harms, and losses.

WHEREFORE the plaintiff demands judgment against the Town, jointly and severally with all other defendants herein, in an amount to be determined by a jury plus costs, interest, attorney's fees, and punitive damages

## COUNT VII
### (Plaintiff v. Nizhoni)
### Negligence

197. The Plaintiff restates and realleges paragraphs 1-196 as if expressly written.

198. Nizhoni owed a duty of reasonable care in the performance of its contract with Eliott to provide medical services to Brendan by seeing that prescribed medications were received and administered to him.

199. Nizhoni knew that Brendan required antipsychotic medications in order to safely live and reside in the group home.

200. Nizhoni knew that Brendan required that his medication be administered twice daily, once in the morning and once in the afternoon.

201.   Nizhoni knew that if Brendan failed to receive his prescribed medication, including his antipsychotic medication, that he would be at serious risk of harm.

202.   Nizhoni breached its duty of care by failing to provide Brendan his prescribed medications on the afternoon of February 11 and again on the morning of February 12, 2022 and acted carelessly and negligently by, among other things:

    a. Changing, without medical approval by a qualified medical practitioner, the administration of Brendan's medications from twice daily to once daily;
    b. Failing to deliver and administer Brendan's medications on the afternoon of February 11, 2022;
    c. Failing to deliver and administer Brendan's medications on the morning of February 12, 2022;
    d. Not making arrangements to contact Brendan;
    e. Not making contact with Brendan's mother via phone; and
    f. Otherwise failing to exercise reasonable care in the performance of its duty under its contract with Eliott.

203.   As a direct and proximate result of the Nizhoni's negligence and failure to provide Brendan with his afternoon and morning dose of prescribed medications, Brendan suffered a mental health crisis resulting in a police encounter, subsequent conscious pain and suffering, and death.

WHEREFORE the plaintiff demands judgment against Nizhoni, jointly and severally with all other defendants herein, in an amount to be determined by a jury plus costs and interest as allowed by law.

<u>**COUNT VIII**</u>
**(Plaintiff v. Afework)**
**Negligence**

204.   The Plaintiff restates and realleges paragraphs 1-203 as if expressly written.

205.   Afework owed a duty, as part of his employment with Nizhoni, to assure that Brendan received his necessary medications.

206.   Afework knew that Brendan required antipsychotic medications in order to safely live and reside in the group home.

207.   Afework knew that Brendan required that his medication be administered twice daily, once in the morning and once in the afternoon.

208.   Afework knew that if Brendan failed to receive his prescribed medication, including his antipsychotic medication, that he would be at serious risk of harm.

209.   Afework breached his duty of care by failing to provide Brendan his prescribed medications on the afternoon of February 11 and again on the morning of February 12, 2022 and acted carelessly and negligently by, among other things:

   a.   Changing, without medical approval by a qualified medical practitioner, the administration of Brendan's medications from twice daily to once daily;
   b.   Failing to provide instructions to other Nizhoni employees concerning access to the Property to provide medication to Brendan;
   c.   Failing to provide instructions to other Nizhoni employees concerning emergency contacts in the event of an unsuccessful delivery or administration of the medication.
   d.   Otherwise failing to exercise reasonable care in the performance of his duty of care.

210.   As a direct and proximate result of the Afework's negligence and failure to provide Brendan with his afternoon and morning dose of prescribed medications, Brendan suffered a mental health crisis resulting in a police encounter, subsequent conscious pain and suffering, and death.

WHEREFORE the plaintiff demands judgment against Afework, jointly and severally with all other defendants herein, in an amount to be determined by a jury plus costs and interest as allowed by law.

**COUNT IX**
**(Plaintiff v. Munya)**
**Negligence**

211. The Plaintiff restates and realleges paragraphs 1-210 as if expressly written.

212. Munya owed a duty of reasonable care in the performance of her duties to provide medical services to Brendan by seeing that prescribed medications were received and taken, including Brendan.

213. Munya knew that Brendan required antipsychotic medications in order to safely live and reside in the group home.

214. Munya knew that if Brendan failed to receive his prescribed medication, including his antipsychotic medication, that he would be at serious risk of harm.

215. Munya breached her duty of care by failing to provide Brendan his prescribed medications on the morning of February 12, 2022 and acted carelessly and negligently by, among other things:

   a. Failing to deliver and administer Brendan his medications on February 12, 2022;
   b. Only knocking on the door and waiting a very short period of time before leaving the Property;
   c. Not making arrangements to contact the Brendan;
   d. Not making arrangements to contact Brendan's mother via phone;
   e. Not arranging to return to the Property before the next scheduled visit; and,
   f. Otherwise failing to exercise reasonable care in the performance of her duty of care.

216. As a direct and proximate result of the Munya's negligence and failure to provide Brendan with his morning dose of prescribed medications, Brendan suffered a mental health crisis resulting in a police encounter, subsequent conscious pain and suffering, and death.

WHEREFORE the plaintiff demands judgment against Munya, jointly and severally with all other defendants herein, in an amount to be determined by a jury plus costs and interest as allowed by law.

**COUNT X**
**(Plaintiff v. Eliott)**
**Negligence**

29

217. The Plaintiff restates and realleges paragraphs 1-216 as if expressly written.

218. Eliott owed a duty of reasonable care in the operation of its Property to provide medical services to residents of the Property by seeing that prescribed medications were received and taken, including Brendan.

219. Eliot knew that Brendan required antipsychotic medications in order to safely live and reside in the group home.

220. Eliot knew that if Brendan failed to receive his prescribed medication, including his antipsychotic medication, that he would be at serious risk of harm.

221. Eliott breached its duty of care by failing to Brendan his prescribed medications on the afternoon of February 11 and the morning of February 12, 2022 and acted carelessly and negligently by, among other things:

   a. Failing to establish procedures and protocols for Nizhoni;
   b. Failing to effectuate a seamless transition of medication administration from Comfort Care to Nizhoni;
   c. Failing to assure that Nizhoni understood Brendan's medication needs;
   d. Failing to provide supervision at the Property;
   e. Not making arrangements to contact the residents of the Property via phone;
   f. Failing to have clinicians and personnel available 24 hours a day; and
   g. Otherwise failing to exercise reasonable care in the performance of its duty in operating a group home for individuals with mental illness.

222. As a direct and proximate result of the Eliott's negligence and failure to assure Brendan was provided with his afternoon and morning doses of prescribed medications, Brendan suffered a mental health crisis resulting in a police encounter, subsequent conscious pain and suffering, and death.

WHEREFORE the plaintiff demands judgment against Eliot, jointly and severally with all other defendants herein, in an amount to be determined by a jury plus costs and interest as allowed by law.

## COUNT XI
### (Plaintiff v. Patrick Aker)
### Negligence

223.  The Plaintiff restates and realleges paragraphs 1-222 as if expressly written.

224.  Aker owed a duty of reasonable care in the performance of his duties to coordinate care for

Brendan.

225.  Aker breached his duty of care by failing to assure for a seamless transition of medication

deliver and administration from Comfort Care to Nizhoni by, among other things:

   a.  Allowing Brendan's medication schedule to be changed without consulting a qualified medical professional;
   b.  Failing to provide instruction to Nizhoni with regard to the medication schedule;
   c.  Failing to provide instruction to Nizhoni with regard to access to the Property;
   d.  Failing to provide instruction to Nizhoni with regard to making arrangements to contact the Brendan;
   e.  Failing to provide instruction to Nizhoni with regard to contacting Brendan's mother via phone; and
   f.  Otherwise failing to exercise reasonable care in the performance of his duty of care.

226.  As a direct and proximate result of the Aker's negligence Brendan suffered a mental health

crisis resulting in a police encounter, subsequent conscious pain and suffering, and death.

WHEREFORE the plaintiff demands judgment against Aker, jointly and severally with all other

defendants herein, in an amount to be determined by a jury plus costs and interest as allowed by

law.

## COUNT XII
### (Plaintiff v. Mary Darby)
### Negligence

227.  The Plaintiff restates and realleges paragraphs 1-226 as if expressly written.

228.  Darby owed a duty of reasonable care in the performance of her duties to coordinate

medication delivery and administration to Brendan.

229. Darby breached her duty of care by failing to assure for a seamless transition of medication

deliver and administration from Comfort Care to Nizhoni by, among other things:

   a. Allowing Brendan's medication schedule to be changed without consulting a
      qualified medical professional;
   b. Failing to provide instruction to Nizhoni with regard to the medication schedule;
   c. Failing to provide instruction to Nizhoni with regard to access to the Property;
   d. Failing to provide instruction to Nizhoni with regard to making arrangements to
      contact the Brendan;
   e. Failing to provide instruction to Nizhoni with regard to contacting Brendan's
      mother via phone; and
   f. Otherwise failing to exercise reasonable care in the performance of his duty of care.

230. As a direct and proximate result of the Darby's negligence Brendan suffered a mental

health crisis resulting in a police encounter, subsequent conscious pain and suffering, and

death.

WHEREFORE the plaintiff demands judgment against Darby, jointly and severally with all other

defendants herein, in an amount to be determined by a jury plus costs and interest as allowed by

law.

### THE PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS SO TRIABLE.


                                        Respectfully submitted,
                                        The Estate of Brendan Reilly,
                                        By its attorneys,


November 20, 2023                       */s/ Michael J. Heineman*
                                        Michael J. Heineman, Esq. (BBO #556841)
                                        Heinlein Beeler Mingace & Heineman, P.C.
                                        276 Union Avenue
                                        Framingham, MA 01702
                                        Tel: (508) 626-8500
                                        MHeineman@HBMHlaw.com